IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 13, 2018

**STATE OF TENNESSEE v. ROBERT TAYLOR**

**Appeal from the Criminal Court for Shelby County**
**No. 16-06191    James M. Lammey, Jr., Judge**

**No. W2017-00765-CCA-R3-CD**

The defendant, Robert Taylor, appeals his Shelby County Criminal Court jury convictions of second degree murder and possession of a firearm by a convicted felon, claiming that the trial court erred by excluding certain evidence, that the evidence was insufficient to sustain his convictions of second degree murder, and that the sentence imposed was excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Claiborne H. Ferguson (on appeal and at trial) and John McNeil (at trial), Memphis, Tennessee, for the appellant, Robert Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kirby May and Meghan Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Shelby County Grand Jury charged the defendant with two counts of first degree murder, two counts of employing a firearm during the commission of a dangerous felony, one count of possessing a firearm after being convicted of a felony drug offense, and one count of possessing a firearm after being convicted of felony evading arrest, all arising from the shooting deaths of Eric Whittaker and Jonathan Triplett. The trial court conducted a jury trial in November 2016.

The State's proof at trial showed that, in April 2014, Eric Whittaker was the president of the Memphis Gentlemen Motorcycle Club ("the Club"). Although the Club

required membership, anyone could be admitted on Thursday nights for a cover charge, and members of other motorcyle clubs could be admitted at a discounted rate. Before entering the Club, all non-members were patted down and searched for weapons. Although the defendant and his friend, Corey Jackson, were not members of the Club, they regularly attended the Thursday night events.

On April 24, 2014, the defendant and Mr. Jackson arrived at the Club late in the evening. At some point, the defendant initiated a brief flirtation with Shakita Wilson, a female member of the Club. A patron known only as "Cowboy" shoved Ms. Wilson, causing Jonathan Triplett, who was a member of another club, to shove Cowboy into a table. Before a fight could break out, Mr. Whittaker intervened and escorted Mr. Triplett to the back patio of the Club. Ms. Wilson, Mr. Jackson, and the defendant followed the duo to the back patio.

Mr. Triplett later reentered the Club, and Mr. Whittaker informed the defendant and Mr. Jackson that they needed to leave because it was closing time. Mr. Jackson stated that he would not leave and proceeded to strike Mr. Whittaker in the face. The defendant followed suit, punching Mr. Whittaker in the face, and Mr. Whittaker fell to the ground. Ms. Wilson retrieved help from inside the Club, and several patrons rushed outside to pull Mr. Jackson and the defendant off of Mr. Whittaker. Ms. Wilson overheard Mr. Jackson state that he was going to kill Mr. Whittaker. Patrons escorted the defendant and Mr. Jackson to the front door of the Club, but Mr. Jackson continued to "rush back" inside the Club and proclaim "who he was going to jump on and who he was going to whoop." When the patrons successfully forced Mr. Jackson out of the Club, Mr. Jackson and Mr. Triplett began to fight.

When the defendant exited the Club, someone handed him a handgun. Witnesses saw this transaction but could not identify the person who provided the defendant with the weapon. The defendant admitted that "a friend of a friend" gave him the handgun, but he did not identify the person in court, stating that he did not know the man's name. After being handed the gun, the defendant walked directly to the unarmed Mr. Whittaker and shot him once at point-blank range in the chest. Witnesses watched Mr. Whittaker fall immediately to the ground. The medical examiner testified that this single gunshot wound was fatal and that Mr. Whittaker's death was "almost immediate." The medical examiner also discovered abrasions on Mr. Whittaker's head and extremities that were "consistent with someone hitting the pavement or someone being hit by some object."

The defendant then turned toward Mr. Triplett and Mr. Jackson, who were still fighting, and shot the unarmed Mr. Triplett multiple times. At that time, other patrons began returning fire, but no other firearms were found at the scene, and no witnesses identified the additional shooters. Witnesses did, however, identify the defendant as the

person who shot both Mr. Whittaker and Mr. Triplett. Although empty knife sheaths were discovered in the clothing of both victims, no knives were found.

When the shooting ceased, patrons moved Mr. Triplett into the Club. Paramedics who arrived a short time later attempted to assist Mr. Triplett, but he later died at the hospital. The medical examiner testified that Mr. Triplett's cause of death was multiple gunshot wounds.

When police officers arrived on the scene, they discovered 22 shell casings, six of which were later proven to have been fired from the defendant's handgun; the remaining shell casings were fired from four unidentified firearms. The defendant was later arrested at the hospital where he had sought treatment for a gunshot wound to his back. Aside from the gunshot wound, officers noticed no other injuries to the defendant. Officers discovered the defendant's firearm and an empty magazine in the defendant's sister's vehicle, and ballistics testing later confirmed that the bullets recovered from the bodies of Mr. Whittaker and Mr. Triplett had been fired from the defendant's handgun.

The parties stipulated that the defendant had prior felony convictions of possession of cocaine with intent to sell and evading arrest in a motor vehicle.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant chose to testify.

According to the defendant, after he and Mr. Jackson followed Mr. Whittaker and Mr. Triplett to the back patio of the Club, Mr. Whittaker informed them that the Club was closing, and Mr. Jackson began to joke with Mr. Whittaker that it was not actually time for the Club to close. In response, Mr. Whittaker punched the defendant in the face several times prompting other patrons to throw the defendant to the ground, kneel on his throat, and hold him at gunpoint while other patrons fought with Mr. Jackson.

The patrons eventually stopped restraining the defendant and escorted him to the parking lot, at which time a "friend of a friend" gave the defendant a handgun just as Mr. Whittaker began "[r]ush[ing] toward" the defendant with a knife. According to the defendant, he did not intend to shoot Mr. Whittaker; instead, he was firing the weapon to scare Mr. Whittaker into backing away from him. The defendant also stated that he did not intend to shoot Mr. Triplett but was simply shooting "in the air" in an attempt to get the patrons who were on top of Mr. Jackson to scatter. The defendant conceded that he never called 9-1-1 and admitted that he fired the handgun until it was empty.

Based on this evidence, the jury convicted the defendant of the lesser included offenses of two counts of second degree murder and convicted the defendant as charged of two counts of possession of a firearm by a convicted felon; the charges of employing a firearm during the commission of a dangerous felony were both dismissed. Following a sentencing hearing, the trial court imposed sentences of 25 years each for the second degree murder convictions, eight years for the conviction of possession of a firearm after being convicted of a felony drug offense, and four years for the conviction of possession of firearm after being convicted of felony evading arrest. The trial court merged the two firearm convictions and ordered all remaining sentences to be served consecutively to one another for a total effective sentence of 58 years. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by excluding certain evidence and that the exclusion of the evidence deprived him of his constitutional right to present a defense, that the evidence adduced at trial was insufficient to sustain his convictions of second degree murder, and that the trial court erred in its imposition of consecutive sentencing. We will address each issue in turn.

## I. Exclusion of Evidence

The defendant first contends that the trial court erred by excluding certain evidence at trial and that the exclusion of that evidence violated his right to present a defense by preventing him from conducting meaningful cross-examination of witnesses against him. Specifically, the defendant posits that the trial court erred by refusing to permit him to question Detectives Fausto and Lundy about statements he had made to them that supported his theory of self-defense.

During cross-examination of both Detective Frias Fausto and Detective Kevin Lundy, defense counsel attempted to inquire about statements the defendant had made shortly after his arrest in an effort to show that the defendant had acted in self-defense. Each time, the State objected on the ground of hearsay, and the trial court sustained the objections, finding that the defendant's out-of-court statements would be offered to prove the truth of the matter asserted and were thus inadmissible hearsay subject to no exception.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802.

- 4 -

As our supreme court has confirmed, "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*, 136 S. Ct. 335 (U.S. Oct. 13, 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions - whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule - are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law.").

In the instant case, the out-of-court statements made by the defendant to the detectives in support of his self-defense theory were certainly offered to prove the truth of the matter asserted and were therefore unquestionably hearsay. The party admissions exception would not be applicable because the defendant was attempting to introduce his own statement, *see* Tenn. R. Evid. 803(1.2), and the statement against interest exception, as advanced by the defendant at trial, was inapplicable because the defendant was not unavailable, *see* Tenn. R. Evid. 804(a), (b)(3). Thus, the trial court committed no error in excluding this testimony as hearsay.

The defendant also contends that the exclusion of this testimony violated his constitutional right to present a defense by preventing him from conducting meaningful cross-examination.

Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, *see Flood*, 219 S.W.3d at 316 (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence[.]" *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302)). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

(1)     Whether the excluded evidence is critical to the defense;

(2)     Whether the evidence bears sufficient indicia of reliability; and

(3)     Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-45; *State v. Rice*, 184 S.W.3d 646, 673 (2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

Here, the trial court refused to admit the defendant's self-serving statements to the detectives on the basis that such statements were inadmissible hearsay. Reviewing this decision against the criteria set forth in *Flood*, we find that the excluded evidence was not critical to the defense. Indeed, the defendant testified at trial and entered into evidence all of the statements he had unsuccessfully sought to introduce through the cross-examination of the detectives. Given the self-serving nature of the statements, we cannot say that their introduction through cross-examination would have borne sufficient indicia of reliability, and the fact that the defendant was successfully able to introduce the statements through his own testimony overrides any concerns over excluding the evidence on the basis of hearsay. Thus, we hold that the trial court did not abuse its discretion by refusing to admit this evidence through cross-examination, and we likewise hold that the defendant's constitutional right to present a defense was not violated.

## II. Sufficiency

The defendant next contends that the evidence adduced at trial was insufficient to support his convictions of second degree murder. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither

re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"Second degree murder is . . . [a] knowing killing of another[.]" T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "The jury may infer a defendant's mental state from 'the character of the assault, the nature of the act and from all the circumstances of the case in evidence.'" *State v. Davis*, 466 S.W.3d 49, 69 (Tenn. 2015) (quoting *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000)).

Here, the proof adduced at trial established that, when the defendant exited the Club in the early-morning hours of April 25, 2014, someone handed the defendant a handgun. The defendant then immediately approached the unarmed Mr. Whittaker and shot him once in the chest, killing him almost instantly. The defendant then turned toward the unarmed Mr. Triplett and shot him multiple times, killing him as well. This evidence is more than sufficient to establish the defendant's convictions of second degree murder. *See Davis*, 466 S.W.3d at 71. Although the defendant argues that he acted in self-defense, the jury heard and rejected this testimony, as was its prerogative. *See Cabbage*, 571 S.W.2d at 835.

Taking all of this evidence into consideration, we hold that the evidence supports the defendant's convictions of second degree murder. Although not raised by the defendant on appeal, we hold that the evidence likewise supports the defendant's firearms convictions.

### III. Sentencing

Finally, the defendant contends that the trial court erred by ordering consecutive sentencing. Again, we disagree.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of

the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are "reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal [conduct]." *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

Here, the record reflects that the trial court, in sentencing the defendant, considered all appropriate principles set forth in Code section 40-35-210(b). The court found no mitigating factors but applied enhancement factors, including the defendant's previous history of criminal convictions or criminal behavior, the employment of a firearm during the commission of the offense, and his lack of hesitation in committing the crimes when the risk to human life was high. S*ee* T.C.A. § 40-35-114(1), (9), (10).[1] Noting that the proof supported convictions of first degree murder, the court then imposed the maximum sentence of 25 years for the second-degree murder convictions as a Range I offender and the maximum sentences of eight years and four years as a Range II offender for the respective firearms convictions. The court ordered consecutive alignment of the murder convictions and concurrent alignment of the firearms convictions, with the latter to be served consecutively to the murder conviction sentences for a total effective sentence of 58 years. Because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of these within-range sentences.

---

[1]     The trial court also applied the enhancement factor for the offense's having involved more than one victim. *See* T.C.A. § 40-35-114(3). Because the defendant was convicted of two counts of second-degree murder, both involving specific, named victims, this factor was erroneously applied. *See State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002). This error, however, does not affect the propriety of the sentence. *See Bise*, 380 S.W.3d at 706.

With regard to sentencing alignment, the trial court based its imposition of consecutive sentencing on dual findings that the defendant had an extensive record of criminal activity and was a dangerous offender. *See* T.C.A. § 40-35-115(b)(2), (4). Contrary to the defendant's assertion, the court did not base the sentencing alignment on a finding that the defendant was a professional criminal. *See* T.C.A. § 40-35-115(b)(1). With respect to the defendant's criminal record, the trial court, referencing the defendant's five-page criminal history, stated "[a]nd to say this is not an extensive record, that's almost laughable." Although the trial court failed to make one of the requisite *Wilkerson* findings—that of the necessity of protecting the public from future criminal acts—in relying on the dangerous offender category, the trial court's finding that the defendant had an extensive criminal history was amply supported by the record and was sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Accordingly, we affirm the sentencing determination of the trial court.

*Conclusion*

Based upon the foregoing analysis, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE